IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAN PROFT and <br> LIBERTY PRINCIPLES PAC, <br><br> *Plaintiffs,* <br><br> v. <br><br> LISA MADIGAN, <br> Attorney General of Illinois, et al. <br><br> *Defendants.* | Case No. 18 C 4947 <br><br> Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Dan Proft and the independent expenditure committee he chairs, Liberty Principles PAC, sued Lisa Madigan, the Attorney General of Illinois, and the members of the Illinois State Board of Elections in their official capacities, alleging that a provision of the Illinois Election Code violates the First and Fourteenth Amendments to the Constitution of the United States. (Dkt. 1.)

The Code generally limits contributions that individuals and organizations may make to candidates for office and their campaigns, but it removes those limits in races where a candidate's self-funding, or independent expenditures supporting or opposing a candidate, exceed a threshold amount. That rule, however, has one important exception that is the subject of this litigation: independent expenditure committees can never contribute to candidates even in races where the Code lifts the limits for everyone else. Attorney General Madigan justifies this exception by invoking the prevention-of-corruption rationale that the Supreme Court recognizes. *See*

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 359 (2010). Proft claims that these groups do not pose a unique threat of corruption and it is not fair to ban them from contributing when all others can do so. To do that, in his view, unreasonably restricts the free-speech and free-association rights of the organizations and the individuals who comprise them.

Proft accordingly moved this Court to preliminarily enjoin Attorney General Madigan from enforcing the Code in the 2018 Election so that he and his committee can participate in races where the Code eliminates contribution limits to the same extent as individuals and other groups. (Dkt. 12.) Attorney General Madigan opposed this motion and moved to dismiss the complaint arguing that independent expenditure committees must remain independent. (Dkt. 19.) Because accepting Proft's argument would erase the Supreme Court's 40-year-old distinction between contributions and independent expenditures, the Court denies his motion for a preliminary injunction and grants Attorney General Madigan's motion to dismiss.

## BACKGROUND

Dan Proft is a political activist. (Dkt. 1 ¶¶ 8–9.) He founded a political committee named Liberty Principles PAC. *Id.* More specifically, Liberty Principles is an independent expenditure committee which the Illinois Election Code defines as an organization, corporation, association, or committee "formed for the exclusive purpose of making independent expenditures during any 12-month period in an aggregate amount exceeding $5,000 in support of or in opposition to . . . [the] election . . . of any public official or candidate." 10 ILCS 5/9-1.8(f). An independent expenditure is "any

payment, gift, donation or other expenditure of funds" for "electioneering communications," or other express advocacy urging the election or defeat of a candidate. 10 ILCS 5/9-1.15.

Basically, these committees are independent because they lack the connection to and coordination with a candidate or campaign that their counterparts, political action committees, have. Indeed, an independent expenditure committee's funding of electioneering communications or express advocacy must "not [be] made in connection, consultation, or concert with or at the request or suggestion of the candidate's political committee or campaign." *Id.* Conversely, a coordinated expenditure is just a contribution of the sort that a political action committee ("PAC") would make. Some observers, in fact, refer to independent expenditure committees as "super PACs" because they can raise and spend unlimited money, provided they do not cooperate or consult with a candidate, her committee, or the committee of a political party.

This distinction is consequential. On the one hand, the Code limits the contribution amounts that PACs can receive and make themselves. *See* 10 ILCS 5/9-8.5(d); *see also* Dkt. 1 ¶ 21. On the other hand, independent expenditure committees may raise and spend money in any amount from any source. *See* 10 ILCS 5/9-8.5(e-5); *see also* Dkt. 1 ¶¶ 36–37. There is, however, one significant exception to these contribution caps: if a candidate's self-funding individually exceeds, or independent expenditures supporting or opposing a candidate collectively exceed $250,000 for statewide office, or $100,000 for all other offices, then all candidates in that race may accept contributions more than the otherwise governing limits. *See* 10 ILCS 5/9-8.5(h); *id.*

at (h-5); *see also* Dkt. 1 ¶ 39. The Legislature decided "that it was better to level the playing field and lift the caps than keep the usual contribution limits in place." (Dkt. 19 at 4.) The Legislature also chose to keep the contribution caps for independent expenditure committees in place because the fact that "they cannot spend in coordination with candidates and cannot contribute directly to them" effectively defines their status. *Id.* Independent expenditure committees remain free to raise and spend funds in any amount. *Id.*

Dan Proft, Chairman of Liberty Principles PAC, alleges that there are multiple races in the 2018 Election where the Code will lift the $100,000 cap. (Dkt. 1 ¶¶ 53–54.) Essentially, Proft wants to directly coordinate with the candidates that he supports in those races. *Id.* at ¶¶ 55–56. Because all others can coordinate and contribute when the caps are off, Proft argues independent expenditure committees should be able to do the same; otherwise, this provision violates the First and Fourteenth Amendments. *Id.* at ¶¶ 65, 69. Proft therefore moved for a preliminary injunction to bar Attorney General Madigan from enforcing the Code's prohibition of coordinated expenditures by independent expenditure committees in races where the Code eliminates the contribution limits. (Dkt. 12 at 1.)

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017), *cert. dismissed sub nom. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ. v. Whitaker ex rel. Whitaker*, 138 S. Ct. 1260 (2018) (citation omitted). To determine whether a

situation warrants such a remedy, district courts analyze the motion in "two distinct phases: a threshold phase and a balancing phase." *Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 965–66 (7th Cir. 2018) (citation omitted). In the threshold phase, the moving party bears the burden of showing that: "(1) without preliminary relief, it will suffer irreparable harm before final resolution of its claims; (2) legal remedies are inadequate; and (3) its claim has some likelihood of success on the merits." *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018) (citation omitted). Only if the moving party satisfies each of these requirements does the court move to the balancing phase, where it must "weigh the harm the plaintiff [or the public] will suffer without an injunction against the harm the defendant [or the public] will suffer with one." *Harlan v. Scholz*, 866 F.3d 754, 758 (7th Cir. 2017) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

Relevant here, "the likelihood of success on the merits is usually the determinative factor when a preliminary injunction is sought on First Amendment grounds." *Higher Soc'y of Indiana v. Tippecanoe Cty., Indiana*, 858 F.3d 1113, 1118 (7th Cir. 2017); *see ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012); *Joelner v. Village of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004). Indeed, the analysis can "begin[ ] and end[ ] with the likelihood of success on the merits of the . . . claim. On the strength of that claim alone, preliminary injunctive relief [may be] warranted," leaving no need for "district courts to weigh the injunction equities." *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013).

## ANALYSIS

Proft argues that the ban on independent expenditure committees' contributions in circumstances where all others may contribute without limit is not a narrowly tailored or closely drawn means of preventing corruption. Attorney General Madigan responds that to adopt this rationale would eliminate the distinction between independent expenditure committees and PACs (those political committees tied to a candidate or party), permitting Proft to circumvent the contribution ban and corrupt the election system.

As a threshold matter, Proft asks this Court to subject the ban on contributions by independent expenditure committees to strict scrutiny, wherein the government must show that the legislature narrowly tailored the law to serve a compelling interest. (Dkt. 13 at 9–10.) In the alternative, Proft requests rigorous First Amendment scrutiny, obligating the government to demonstrate that the legislature closely drew the statute to serve a sufficiently important interest. (Dkt. 13 at 10–11.)

True enough, "[m]ost laws that burden political speech are subject to strict scrutiny. For challenges to contribution limits, however, the Supreme Court has adopted a form of intermediate scrutiny: 'Campaign contribution limits are generally permissible if the government can establish that they are 'closely drawn' to serve a 'sufficiently important interest.'" *Illinois Liberty PAC v. Madigan*, No. 16-3585, 2018 WL 4354424, at *4 (7th Cir. Sept. 13, 2018). The only "sufficiently important interest" recognized by the Supreme Court is the prevention of actual or apparent quid pro quo corruption. *See id.*

In this case, the Illinois ban on independent expenditure committees' contributions is just the most significant type of contribution limit: prohibition. *Cf. FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 (2001) (applying the intermediate standard of rigorous First Amendment scrutiny to uphold caps on coordinated party expenditures because they function like contributions). The Supreme Court permits states to entirely bar certain kinds of entities from contributing to candidates. *See Catholic Leadership Coal. of Texas v. Reisman*, 764 F.3d 409, 442–43 (5th Cir. 2014) (citing *FEC v. Beaumont*, 539 U.S. 146, 149 (2003) (recognizing that federal law bars corporations from contributing directly and therefore holding the proscription of nonprofit advocacy corporations' contributions to candidates constitutional)); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 320 (2010) (citing 2 U.S.C. § 441(b) (observing that federal law forbids unions from directly contributing to candidates)).

It follows, then, that Attorney General Madigan must proffer "a sufficiently important interest and employ [ ] means closely drawn" to defend the state's prohibition of Proft's proposed contributions. *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 214 (2014); *cf. Catholic Leadership Coal. of Texas*, 764 F.3d at 444. Attorney General Madigan does so here, and even if this Court applied strict scrutiny, it would still hold the ban constitutional.

I. **Sufficiently Important Interest**

Proft argues that an independent expenditure committee's contributions or coordination would pose no greater threat of corruption than those by any other entity

or individual, let alone a threat so great that justifies the complete ban. Proft also contends that when the Code lifts the caps for everybody except the independent expenditure committees, there are no longer any contribution limits to circumvent.

### A.     Prevention of Corruption

In modern elections, fundraising is essential because candidates depend on individual financial contributions to run their campaigns. *See Buckley v. Valeo*, 424 U.S. 1, 26 (1976). Large contributions, then, pose the risk of being "given to secure a political quid pro quo from current and potential office holders . . ." *Id.*; *see Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985) ("The hallmark of corruption is the financial quid pro quo: dollars for political favors."). Simply put, influencing elected officials to act contrary to the obligations of their offices through the expectation of money flowing to themselves or into their campaigns subverts the democratic process.

Consequently, states may limit and even bar direct contributions to candidates to prevent actual corruption or the appearance thereof to maintain the integrity of and public confidence in American elections. *See Citizens United v. Fed Election Comm'n*, 558 U.S. 310, 344, 356–57, 359 (2010) (citing *Buckley*, 424 U.S. at 25–28, 30, 45–48). Contribution ceilings, however, are distinct from independent expenditure limits because the latter are made independent of the candidate and her campaign, and that absence of prearrangement and coordination alleviates the danger of corruption. *See id.* at 344, 356–57 (citing *Buckley*, 424 U.S. at 25–27, 45, 47).

For over 40 years, the Supreme Court has distinguished "between independent expenditures on behalf of candidates and direct contributions to candidates." *Siefert v. Alexander*, 608 F.3d 974, 988 (7th Cir. 2010) (noting that *Citizens United* reinforced this distinction from the 1976 case *Buckle v. Valeo*). Recognizing this bedrock principle of the Court's campaign-finance jurisprudence is nearly dispositive of this matter. *See Ariz. Free Enterprise Club's Freedom Club Pac v. Bennett*, 564 U.S. 721, 734–35 (2011); *Citizens United*, 558 U.S. at 343–47; *McConnell v. FEC*, 540 U.S. 93, 202–03 (2003), *overruled in part on other grounds by Citizens United*, 558 U.S. at 310; *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 437 (2001); *Buckley v. Valeo*, 424 U.S. 1, 46–47, 78 (1976).

Indeed, this was the fundamental proposition relied on and applied by the Court in *Citizens United* when it prohibited limits on corporate independent expenditures. *See* 558 U.S. at 357 (internal quotation marks omitted); *id.* at 360 ("By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate."). So, "although the First Amendment protects *truly* independent expenditures for political speech, the government is entitled to regulate coordination between candidates' campaigns and *purportedly* independent groups." *O'Keefe v. Chisholm*, 769 F.3d 936, 941 (7th Cir. 2014) (emphasis added).

Courts across the Country acknowledge and appreciate this tenet of free speech law. *See Colorado Republican Fed. Campaign Comm. v. Fed. Election Comm'n*, 518 U.S. 604, 617 (1996) (calling it the "constitutionally significant fact"); *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985)

(describing it as the "fundamental constitutional difference"); *see, e.g., Stop This Insanity, Inc. Employee Leadership Fund v. Fed. Election Comm'n*, 902 F. Supp. 2d 23, 38 (D.D.C. 2012), *aff'd*, 761 F.3d 10 (D.C. Cir. 2014) (emphasizing it as an "essential counterweight," and explaining that "there can be little doubt that the *independence* of independent expenditures is the lynchpin that holds together the principle," and "if express advocacy for particular federal candidates were to lose its independence (either in reality or appearance), it stands to reason that the doctrine carefully crafted in *Citizens United* and *SpeechNow* would begin to tumble back to Earth.") (emphasis in original); *Vermont Right to Life Comm., Inc. v. Sorrell*, 875 F. Supp. 2d 376, 405–06 (D. Vt. 2012), *aff'd*, 758 F.3d 118 (2d Cir. 2014) (referring to this issue as the "touchstone" of the constitutional analysis).

Proft's argument fails to take into account this important distinction regarding independent expenditures—that they must be truly independent. This is, after all, the basic premise of the Supreme Court's campaign-finance law. In fact, "[a] number of the courts that have struck down limits on contributions applied to independent-expenditure-only PACs have made clear their reasoning would not hold to the extent the assumption of independence were undermined." *Vermont Right to Life Comm., Inc.*, 875 F. Supp. 2d at 405–06 (citing *Wis. Right to Life State PAC v. Barland*, 664 F.3d 139, 155 (7th Cir. 2011); *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 696–97 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 392 (2010); *SpeechNow.org v. FEC*, 599 F.3d 686, 696 (D.C. Cir. 2010); *N.C. Right to Life, Inc. v.*

*Leake*, 525 F.3d 274, 295 (4th Cir. 2008); *Yamada*, 872 F. Supp. 2d 1023, 1041 (D. Haw. 2012), *aff'd sub nom.*, *Yamada v. Snipes*, 786 F.3d 1182 (9th Cir. 2015)).

Similarly, when that independence is eliminated, the very concerns of corruption enter the picture. *See Alabama Democratic Conference v. Broussard*, 541 F. App'x 931, 935–36 (11th Cir. 2013) ("When an organization engages in independent expenditures as well as campaign contributions . . . its independence may be called into question and concerns of corruption may reappear."). The Seventh Circuit identified this issue in *Wisconsin Right to Life State PAC*. There, the court rejected an allegation of an indirect appearance of corruption, however it posited that if an "independent committee is not truly independent . . . the committee would not qualify for the free-speech safe harbor for independent expenditures; the First Amendment permits the government to regulate *coordinated* expenditures." 664 F.3d at 155 (citing *Colo. Republican*, 533 U.S. at 465).

The Seventh Circuit reiterated that collusion between a candidate and an independent committee contravenes their division in *O'Keefe v. Chisholm*. In that case, the court recognized that the government may constitutionally regulate supposed independent organizations because "[i]f campaigns tell potential contributors to divert money to nominally independent groups that have agreed to do the campaigns' bidding, these contribution limits become porous, and the requirement that politicians' campaign committees disclose the donors and amounts becomes useless." 769 F.3d at 941.

In Proft's case, Liberty Principles would maintain an "otherwise indistinguishable candidate contribution account." *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 143 (2d Cir. 2014). When an independent expenditure committee is "enmeshed financially and organizationally" by directly contributing to candidates, there is no longer a lack of prearrangement and coordination. *Id.* at 141. Without any kind of organizational separation, Liberty Principles could coordinate at-will with candidates and campaigns, making it no longer "functionally distinct" as an independent expenditure committee. *Id.* at 142.

A single entity such as that, which conducts both activities, appears corrupt on its face. *See, e.g., Stop This Insanity, Inc. Employee Leadership Fund*, 902 F. Supp. 2d at 43 (noting that the entity would look like it was "in cahoots with the candidates and parties that it coordinates with and supports"). Direct contributions made by independent expenditure committees compromise their independence. With no bulwark in place, a group like Liberty Principles would be free to coordinate with candidates and political parties, making the potential for corruption quite real and apparent. *Cf. Republican Party of New Mexico v. King*, 741 F.3d 1089, 1101 (10th Cir. 2013). To the unsophisticated voter, all the organization's spending (expenditures and contributions alike) would appear to come from the same source. *See, e.g., Stop This Insanity, Inc. Employee Leadership Fund*, 902 F. Supp. 2d at 43; *Vt. Right to Life Comm., Inc.*, 875 F. Supp. 2d at 408 (indicating that "the structural melding" between an independent expenditure committee and a PAC "leaves no significant functional

divide between them for purposes of campaign finance law," and their "nearly complete organizational identity poses serious questions").

*Citizens United* further supports this proposition. There, the independence and uncoordinated nature of the expenditures alleviated the Supreme Court's concerns about corruption. *See* 558 U.S. at 357. Without that foundation, however, the "danger that expenditures will be given as a quid pro quo for improper commitments from the candidate" is very real. *Id.* The existence of prearrangement with the candidate or her agent provide leverage. Indeed, expenditures made after a "wink or nod" often will be "as useful to the candidate as cash." *Colo. Republican*, 533 U.S. at 446. Therefore, Attorney General Madigan has a sufficiently important interest in preventing corruption or the appearance thereof.

### B.  Anti-Circumvention

Proft's circumvention argument puts the cart before the horse. Properly understood, the Illinois ban on independent expenditure committees' contributions is indeed a contribution limit. The distinction is one of degree and not of kind. A ban is, in fact, the most severe limitation of contributions possible. So treated, Attorney General Madigan has a sufficiently important interest in combatting the grave risk that Liberty Principles will circumvent this limit by spending enough on its own to lift the caps, freeing it to coordinate and directly contribute to candidates. *Cf. FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 (2001) (holding that a state may restrict a party's coordinated expenditures, unlike truly independent expenditures, to minimize the circumvention of constitutional caps).

Proft would have this Court abolish the Supreme Court's carefully crafted contribution-or-expenditure litmus test so he can "raise unlimited funds," "spend unlimited amounts," "make unlimited contributions to the candidates he supports," and "communicate and coordinate freely with those candidates." (Dkt. 13 at 5 (citing Dkt. 1 at ¶¶ 42–43).) It appears, then, that what Proft would really like is to have his cake and eat it too. *Cf. Stop This Insanity, Inc. Employee Leadership Fund*, 902 F. Supp. 2d at 50. Proft wants to enjoy the benefits of an independent expenditure committee (unlimited fundraising and spending abilities), while also enjoying the benefits of a PAC (capacity to directly contribute, communicate, and coordinate with candidates). *See, e.g., id.* "Choices have consequences," however, and Proft must live with the limitations of the entity he chose to establish. *See, e.g., id.*

Moreover, to the extent that Proft insists on maintaining a "hybrid PAC" that could independently expend and directly contribute as much money as it wanted to in races where the Code lifts the caps, other courts expressly disavow of a similar practice. At least three circuits hold that keeping separate bank accounts for independent expenditures and campaign contributions inadequately eliminates corruption or its appearance and therefore the states may constitutionally limit contributions to the independent expenditure accounts. *See Alabama Democratic Conference v. Attorney Gen. of Alabama*, 838 F.3d 1057, 1066 (11th Cir. 2016), *cert. denied sub nom. Alabama Democratic Conference v. Marshall*, 137 S. Ct. 1837 (2017); *see Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 143 (2d Cir. 2014); *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 443 (5th Cir. 2014). One circuit holds

that separate bank accounts are sufficient to alleviate corruption concerns where an organization makes both direct contributions and independent expenditures. *See Republican Party of N.M. v. King*, 741 F.3d 1089, 1097 (10th Cir. 2013).

The Eleventh Circuit was the most recent court to pass on the issue. In *Alabama Democratic Conference*, the court asserted that an "account set up for independent expenditures can pass muster under a state's interest in anti-corruption only when it is truly independent from any coordination with a candidate." 838 F.3d at 1068. The Eleventh Circuit, agreeing with the Second and Fifth Circuits and disagreeing with the Tenth Circuit, reasoned that these separate bank accounts must have all of the indicia of true independence in order to be supported:

> To create the necessary independence, an organization must do more than merely establish separate bank accounts for candidate contributions and independent expenditures. There must be safeguards to be sure that the funds raised for making independent expenditures are really used only for that purpose. There must be adequate account-management procedures to guarantee that no money contributed to the organization for the purpose of independent expenditures will ever be placed in the wrong account or used to contribute to a candidate.

*Id.* The court continued:

> Beyond sufficient structural separations within the organization, it is also necessary that the same people controlling the contributions to candidates are not also dictating how the independent expenditure money is spent. . . . Different people must functionally control the spending decisions for the different accounts. Having the same person in control of both accounts threatens the perceived "independence" of the independent expenditure-only account. How could a person simply "forget," for example, everything she knows about coordinated spending efforts or contributions to candidates when turning her focus to the independent expenditure-only account?

*Id.* at 1069 (citation omitted).

The prevention of the commingling of funds (expenditures and contributions) is the very essence of a valid anti-circumvention interest: money raised for independent expenditures must be used only for that purpose. Those funds may never be used to contribute to a candidate. In addition to the accounts being structurally separate, different people must control them. Otherwise, the independent committee stands to lose its independence, washing away otherwise prophylactic measures such as disclosure requirements. This interest permits states to "undertake some reasonable measures to ensure that any contribution limits are not circumvented." *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 444 (5th Cir. 2014).

In Proft's case, he alleges no safeguards such as separate bank accounts or different money managers. Quite to the contrary, it seems that the staff and resources handling both expenditures and contributions would overlap, there would be little to no financial independence, and the committee would coordinate activities and share information with candidates and their campaigns. *See Alabama Democratic Conference*, 838 F.3d at 1068. Essentially Proft wants to run an independent expenditure committee without having to adhere to any of the limitations that define such a committee. Moreover, the defining characteristic of an independent expenditure committee does not change simply because the Code lifts the contribution limits for entities *already permitted to contribute*. Proft would have this Court approve of Liberty Principles' ability to "pass along the donors' funds to candidates or coordinate with candidates in making expenditures . . ." *Republican Party of New Mexico v. King*, 741 F.3d 1089, 1102 (10th Cir. 2013). Indeed, even the Tenth Circuit, the one court that

validated separate bank accounts in hybrid PACs, reasoned that this would lead to a "possibility that unlimited contributions for independent expenditures will enable donors to skirt otherwise valid contribution limits." *Id.* Accordingly, Attorney General Madigan also has a sufficiently important interest in anti-circumvention.

### III. Closely Drawn Means

In this context, the focus of the "closely drawn" inquiry is "whether the contribution limits . . . are above the 'lower bound' at which 'the constitutional risks to the democratic electoral process become too great.'" *Illinois Liberty PAC v. Madigan*, No. 16-3585, 2018 WL 4354424, at *5 (7th Cir. Sept. 13, 2018) (citing *Randall v. Sorrell*, 548 U.S. 230, 248 (2006) (plurality opinion)). Courts defer to the legislature so long as "the challenged contribution caps exceed that lower boundary." *Id.* (citing *Davis v. FEC*, 554 U.S. 724, 737 (2008); *Randall*, 548 U.S. at 248 (plurality opinion) ("We cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives.")); *see Buckley v. Valeo*, 424 U.S. 1, 30 (1976) (stating that "a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000.").

Here, the Illinois Legislature lifted contribution caps in races where spending exceeds the requisite threshold for all parties that could contribute in the first place. The fact that the Legislature did not recognize independent expenditure committees' right to contribute is unsurprising considering those groups did not previously have that right. There is a critical difference in organizational structure and purpose germane to this case: independent expenditure committees can raise and spend as much

money as they want, which would swallow all other limitations and nullify the purpose of the committee.

Furthermore, states are not left only to disclosure regulations and a committee's good faith to prevent corruption and its appearance; they may, in addition, impose contribution caps. *See Catholic Leadership Coal. of Texas*, 764 F.3d at 444 (citing *Buckley*, 424 U.S. at 27–28 (explaining that Congress was within its rights to conclude that "disclosure was only a partial measure, and that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions, even when the identities of the contributors and the amounts of their contributions are fully disclosed.")). Illinois' suppression of independent expenditure committee's contributions to candidates is a closely drawn means of preventing corruption or its appearance. Consequently, it is constitutional under the First Amendment.

## IV. Equal Protection

Proft complains of the same injuries under the Equal Protection Clause of the Fourteenth Amendment that he did under the free-speech and association clauses of the First Amendment. But "it makes no difference whether a challenge to the disparate treatment of speakers or speech is framed under the First Amendment or the Equal Protection Clause." *See, e.g., Illinois Liberty PAC v. Madigan*, 902 F. Supp. 2d 1113, 1126 (N.D. Ill. 2012), *aff'd*, No. 12-3305, 2012 WL 5259036 (7th Cir. Oct. 24, 2012) (internal citations omitted). Because the First Amendment claim failed, so, too, does the Fourteenth Amendment claim. *Cf. Illinois Liberty PAC v. Madigan*, No. 16-

3585, 2018 WL 4354424, at *5 n.4 (7th Cir. Sept. 13, 2018) (explaining that the "Court has also deferred to legislative judgments setting contribution limits when the challenge proceeds under the Equal Protection Clause.").

## V. Other Preliminary Injunction Factors

Proft's inability to succeed on the merits of his claims is reason enough to deny his preliminary injunction motion. Further consideration of the balance of harms and the public interest, however, confirms that relief should be denied because "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *See Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, C.J., in chambers)).

If this Court were to grant a preliminary injunction, there would be nothing stopping independent expenditure committees from contributing to and coordinating with candidates and their campaigns in the weeks leading up to the 2018 Election. This would potentially lead to actual or apparent corruption, irreparably harming the people of Illinois and the public interest in maintaining the integrity of the electoral process. That harm far outweighs any harm that the challenged provision imposes on Proft and his committee: they may still raise and spend unlimited funds *independent* of the candidates. But the Constitution does not demand that they be able to contribute.

## CONCLUSION

Because the Supreme Court's campaign-finance jurisprudence depends on the underlying rule that independent expenditure committees remain independent of candidates and campaigns by not directly contributing to or coordinating with them, the Court must deny Proft's motion for preliminary injunction and grant Attorney General Madigan's motion to dismiss.

_____
Virginia M. Kendall
United States District Judge

Date: October 24, 2018